UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Peter St. Laurent,
Complainant,

v.

United Parcel Service,
Respondent.

CIVIL ACTION NO. 04-CV-11951-JGD

**PLAINTIFF'S OPPOSITION TO UNITED PARCEL SERVICE, INC.'S MOTION FOR SUMMARY JUDGMENT**

**FACTUAL BACKGROUND**

Peter St. Laurent is 56 years old, has a high school degree, and is married with four children. He began working for United Parcel Service ("UPS") in approximately 1974 as a package delivery man, also known as a driver. (St. Laurent Dep., Vol. 1 at 6.) UPS is a multi-million dollar international company with thousands of employees in the United States.

Mr. St. Laurent's job as a driver requires him to deliver packages that range from the size and weight of an envelope to over 150 pounds. (St. Laurent Dep., Vol. 1 at 7.) Mr. St. Laurent is not required to lift anything that weighs greater then seventy pounds without assistance. Id. According to Mr. St. Laurent, approximately half of his time is spent driving and the other half lifting. (St. Laurent Dep., Vol. 2 at 17.)

Mr. St. Laurent was required to make numerous stops during the day to pick-up and deliver packages. Most stops did not require Mr. St. Laurent to lift heavy weights, and the larger stops that usually had multiple packages would have loading bays to make pick-ups easier. (St. Laurent Dep., Vol. 1 at 11.) If Mr. St. Laurent was delivering numerous packages at a single location, carts were available to help him transport the packages. Id. at 12. Further, the trucks Mr. St. Laurent now uses are built in such a way that it is easy to get in and out of the truck, and easy to get packages out of the truck. Id. at 15-16. Mr. St. Laurent did not repetitively lift packages, as he was typically required to lift a small number of packages at most sites separated by driving from site to site. Id. at 8-9, 12.

On November 13, 2000, Mr. St. Laurent suffered a work-related back injury when he leaned over to pick up his keys and strained his back. Id. at 19. Mr. St. Laurent returned to work on approximately December 11, 2000 after this injury. Id. At no time did UPS require Mr. St. Laurent to be examined by a company doctor prior to this return. Id.

Mr. St. Laurent continued to work until January of 2001, at which time he aggravated his back and left work. Id. at 20. Mr. St. Laurent received workers' compensation benefits during this period from Liberty Mutual Insurance Company, UPS' workers' compensation insurance carrier. (See "Attachment A.") On March 26, 2001, Mr. St. Laurent returned to work. (St. Laurent Dep.,

Vol. 1 at 20.) Again, he was never required to be examined by a UPS doctor before his return, however, he was only able to work a few days before departing again due to back pain. Id. Mr. St. Laurent left work on March 26, 2001 due to his work-related back injury and again received workers' compensation benefits. (See "Attachment A.")

On May 22, 2001, Liberty Mutual Insurance Company, UPS's workers' compensation insurance carrier, hired Dr. Isadore G. Yablon to examine Mr. St. Laurent. (St. Laurent Dep., Vol. 1 at 21 - 23.) (St. Laurent Dep., Vol. 1 Ex. 1., see "Attachment B.") On May 29, 2001, Mr. St. Laurent was feeling fine. He saw his doctor who cleared him to return to work full duty. He was given a note clearing him to return to work. (See "Attachment C"; see also "Attachment D," affidavit of Peter St. Laurent.) At this time, based on his doctor's and his own opinion, Mr. St. Laurent did not have any limitations on his ability to do his job. (St. Laurent Dep., Vol. 2 at 17.) But Mr. McGovern told Mr. St. Laurent that he could not return to work. ("Attachment D," affidavit of Peter St. Laurent.)

Dr. Yablon concluded that Mr. St. Laurent could work with a 25 pounds lifting restriction. (St. Laurent Dep., Vol. 1 at 22.) In mid-June of 2001, Mr. St. Laurent went to see Mr. McGovern to find out when he could return to work per the clearance of his doctor, and was told he could not return because of the lifting restriction placed on him by Dr. Yablon. ("Attachment D,"

affidavit of Peter St. Laurent.)

Mr. St Laurent responded to Mr. McGovern that if UPS is claiming that he cannot lift, then it should give him a job that does not require lifting, or could send him to feeder school. Id. One month later Mr. St. Laurent followed up on his request for alternate work, specifically feeder school, and was told by Mr. McGovern that it was not an option. Id.

UPS refused to let Mr. St. Laurent return to work. (St. Laurent Dep., Vol. 1 at 24.) Instead, it insisted that Mr. St. Laurent be seen by another doctor. (Id. at 27)

UPS allowed numerous employees to return to work in the past by simply accepting a note from their treating doctor, or not requiring a note at all. A list of such employees include Drew Stetz who had surgery on his left knee in 2001 and in 2003 he had hemorrhoid surgery; on both occasions he was able to return to work with only a note from his doctor. (See "Attachment E," affidavit of Drew Stetz.) Paul Nolan, who worked as a shop steward for UPS, broke his ankle and was able to return to work four months later with only a note from his doctor. (See "Attachment F," affidavit of Paul Nolan.) Mr. Nolan also knows of numerous other UPS employee who suffered injuries and were able to return to work with either no note or simply a note from their treating doctor. Id. Mr. John Whitehead injured his left knee and had surgery in 1996, injured his left knee again in 1999, and again injured his left knee and had surgery in 2004.

(See "Attachment G," affidavit of John Whitehead.) After all three injuries, he was able to return to work with only a note from his treating doctor. Id. In 1997, Mr. Whitehead suffered a heart attack and was able to return to work simply with a note from his treating doctor releasing him. Id. Unlike these other employees, UPS insisted that Mr. St. Laurent see another doctor.

On July 30, 2001, a list of three doctors was provided to Mr. St. Laurent to choose a doctor to examine him. Mr. St. Laurent chose a doctor on that list, but was instructed that he could not be seen by that doctor and instead had to see one of the other two. (St. Laurent Dep., Vol. 1 at 27.) UPS refused to provide a reason as to why it would not allow Mr. St. Laurent to see the doctor he chose. Id. Mr. St. Laurent declined to pick one of the remaining two doctors, and insisted that he be given a new set of three doctors by UPS. Id. On September 12, 2001, Mr. St. Laurent was given a new list of doctors and he selected Dr. Nason Burden. Id. at 28. (St. Laurent Dep., Vol. 1 Ex. 3., see "Attachment H.") Mr. St. Laurent was examined by Dr. Burden on October 12, 2001. (St. Laurent Dep., Vol. 1 Ex. 4, see "Attachment I.")

After this examination, Dr. Burden noted in his report that Mr. St. Laurent has a "very mild" spinal stenosis, a "minimal" amount of degenerative disc disease, no scar tissue, no pain into his legs, and he "feels good." Id. After his physical examination, Dr. Burden wrote that Mr. St. Laurent has a "normal

range of motion and no objective evidence of any significant lumbo-sacral pathology." Id. Dr. Burden opined that Mr. St. Laurent could work, but "a better effective work effort would be expected if he had some restrictions on lifting heavy weights, particularly in a repeated manner or such as is exerted on the lower back with torque twisting function when loaded." Id. On November 9, 2001, Dr. Burden authored an addendum clarifying his opinion in his October 18, 2001 report. In this report, Dr. Burden specifically opined that Mr. St. Laurent could return to work at UPS as a driver "if consideration were given to his degree of repetition of lifting on the job requirement description of seventy pounds and the occasional lifting and moving up to one hundred fifty pounds." (St. Laurent Dep., Vol. 1 Ex. 5, see "Attachment J.")

Mr. St. Laurent testified that Dr. Burden's limitations did not "interfere in any way with [his] ability to drive or any of the elements of driving a truck." (St. Laurent Dep., Vol. 2 at 17.) He further testified that the only limitations that Dr. Burden placed on him was heavy lifting and that "almost all" of the lifting element of his job could have been done with Dr. Burden's restriction. Id. at 18. Despite receiving Dr. Burden's report, UPS refused to let Mr. St. Laurent return to work and "wouldn't entertain any thought of accommodating [him]." (St. Laurent Dep. Vol. 2 at 14.)

This was in sharp contrast to UPS's past action in 1996 when

UPS offered Mr. St. Laurent a light-duty position with no lifting over thirty pounds after he suffered a work-related injury. Id. at 18. (St. Laurent Dep., Vol. 2 Ex. 9, see "Attachment K.")

On July 26, 2002, Mr. St. Laurent again went to UPS with another disability note from his treating doctor re-affirming his ability to return to work without any restrictions. (See "Attachment L.") Mr. St. Laurent's medical condition did not change in any way since his release to return to work full duty in May of 2001. Again, UPS refused to allow Mr. St. Laurent return to work and instead scheduled an appointment with a doctor of its choice, Dr. Robert Naparstek. (St. Laurent Dep., Vol. 1 at 34.)

Mr. St. Laurent was examined by Dr. Naperstek on September 11, 2002. Dr. Naperstek advised that Mr. St. Laurent needed to undergo a functional capacity evaluation which will actually test his ability to lift weight. (St. Laurent Dep., Vol. 1 Ex. 6, see "Attachment M.") No UPS doctor ever actually physically tested Mr. St. Laurent's physical abilities. Dr. Naperstek wanted Mr. St. Laurent to take one month to work out in a gym in preparation for the examination. Id. Mr. St. Laurent returned to Dr. Naperstek on October 9, 2002 and undertook a functional capacity examination which he passed with ease. (St. Laurent Dep., Vol. 1 Ex. 7, See "Attachment N.") In fact, Mr. St. Laurent was able to lift 70 pounds on his own, up to 150 pounds with the assistance of another and up to 250 pounds with a pallet

jack. Id. Finally, UPS allowed Mr. St. Laurent to return to work in October of 2002. (St. Laurent Dep. Vol. 1 at 37.)

## LEGAL ARGUMENT

### I. Summary Judgment Standard

Summary judgement should be denied where there is the "slightest doubt as to [a] material fact." Mass-Rosenberg Verftas v. General Dynamics Corp., 78 F.R.D. 55, 58 (D. Mass. 1977). Summary judgment should be granted only if the plaintiff "has no reasonable expectation of proving an essential element of his case." Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); see also Johnson v. Chateau DeVille, Inc., 20 Mass. App. Ct. 933 (1985); Noyes v. Quincy Mutual Fire Ins. Co., 7 Mass. App. Ct. 723 (1979). It is established that even a "toehold . . . is enough to survive a motion for summary judgment." Marr Equipment Corp. v. I.T.O. of New England, 14 Mass. App. Ct. 231, 235 (1982).

### II. Summary Judgment Should Be Denied Because A Reasonable Fact-Finder Could Find Mr. St. Laurent Was Discriminated Against Based On His Disability.

In Massachusetts, it is unlawful for an employer "to dismiss from employment or refuse to hire, rehire or advance in employment or otherwise discriminate against, because of his handicap," a qualified handicapped person capable of performing the essential functions of the job with reasonable accommodation,

unless the accommodation imposes an undue hardship. Mass. Gen. L. ch. 151B § (4)(16)(2004). To satisfy a disparate treatment claim, a Complainant must first establish a prima facie case, showing that he is an otherwise qualified handicapped person and make an inference that she was discriminated against based on handicap. The burden then shifts to the Respondent, who must show that the Complainant was harmed for reasons other than her handicap. The burden shifts back to the Complainant, who must show that the reasons given by the Respondent are pretext. Labonte v. Hutchins v. Wheeler, 424 Mass. 813, 821, 678 N.E.2d 853, 859 (1997); Dartt v. Browning-Ferris Indus., 691 N.E.2d 526, 427 Mass. 1 (1998). The Supreme Judicial Court held that to succeed on a claim, a complainant does not need to show that the respondent's actions were based "solely" on the complainant's handicap. Dartt, 427 Mass. at 8-9, 691 N.E.2d at 531. Rather, the handicap need only have been a factor when the discrimination took place. Id. If a complainant establishes a prima facie case, and a respondent offers a legitimate, non-discriminatory reason for its actions, issues of pretext should be reserved for a jury. Labonte, 678 N.E.2d at 858, 424 Mass. at 820 ("taking the question out of the jury's hands is disfavored in the context of discrimination cases based on disparate treatment because the ultimate issue is often that of intent, and is a factual question.")

**A. Mr. St. Laurent Is A Qualified Handicapped Person under Mass. Gen. L. ch 151B and Was Able to Perform the Essential Job Function With, or Without, Accommodation.**

According to the Massachusetts General Laws "[t]he term "handicap" means (a) a physical or mental impairment which substantially limits one or more major life activities of a person; (b) a record of having such impairment; or (c) being regarded as having such impairment. . . ." Mass. Gen. L. ch. 151B § 1(17) (2004).

By statute, any employee who "sustained a work-related injury and is capable of performing the essential functions of a particular job, . . . with reasonable accommodations, shall be deemed to be a qualified handicapped person under the provisions of chapter one hundred and fifty-one B." Mass. Gen. L. ch 152, § 75B (1999). The District Court of Massachusetts interpreting state law found that "An employee <u>injured at work</u>, who would have been able to perform her job with reasonable accommodation for her injury, could be considered a 'qualified handicapped person' as traditionally defined by Mass. Gen. Law ch. 151B, § 1(16)." <u>Gilman v. C&S Wholesale Grocers, Inc.</u>, 170 F. Supp. 2d 77, 84, 2001 U.S. Dist. LEXIS 16163 at *18 (D. Mass. 2001) <u>citing</u> <u>Everett Indus., Inc. v. Mass. Comm'n Against Discrimination</u>, 49 Mass App. Ct. 1116, 735 N.E.2d 1271, 2000 WL 147632, at *5 (Mass App. Ct. June 29, 2000). Such an "employee is presumed to be a qualified handicapped person pursuant to section 75B.'" [citation omitted.], and the Federal District Court of Massachusetts

specifically found that "the Appeals Court thereby implies that section 75B(1) ought to be read so as to deem individuals suffering work related injuries, without more, to be qualified handicapped persons under 151B, . . ." Id. at 84, 2001 U.S. Dist. LEXIS 16163 at *19.

"The state legislature may well have assumed that an injury sufficient to qualify an individual for workers' compensation was sufficient to impair that person's ability to 'work,' one aspect of a major life activity. Id. at 84-85, 2001 U.S. Dist. LEXIS 16163 at 21.

An Employer is obligated to provide a reasonable accommodation "unless the employer can demonstrate that the accommodation required . . . would impose an undue hardship on the employer's business." Mass. Gen. L. ch 151B, § 4(16) (2004).

Whether a job function is essential, requires the fact-finder to look at the job guidelines, as well as the totality of the factual circumstances surrounding the job. "For purposes of Mass. Gen. Laws ch. 151B, § 4(16), the question of essential function is intensely fact-based and requires individualized inquiry and appropriate findings of fact." Cargill v. Harvard University, 60 Mass. App. Ct. 585, 587, 804 N.E.2d 377, 380; Cox v. New England Tel. and Tel. Co., 414 Mass. 375, 383, 607 N.E.2d 1035, 1040 (1993) quoting from School Bd. Of Nassau County v. Arline, 480 U.S. 273, 287 (1987) ("In most cases involving a claim of discrimination in employment on account of handicap, in

order to answer the question whether the plaintiff is otherwise qualified, 'the [trial judge] will need to conduct an individualized inquiry and make appropriate findings of facts.'").

Mass. Gen. L. ch. 151B § 4(16) does not define "essential functions," therefore the Supreme Judicial Court of Massachusetts has looked to both the Massachusetts Commission Against Discrimination (MCAD) guidelines and to Federal case law. Labonte, 424 Mass. at 823 n.13, 678 N.E.2d at 860 n.13; Cox v. New England Tel. and Tel. Co., 414 Mass. 375, 382, 607 N.E.2d 1035, 1039 (1993) (looking to Federal law for guidance in employment discrimination cases); Smith v. Bell Atlantic, NO. 03-P-1522, 2005 Mass. App. LEXIS 555, at *1 (June 10, 2005)("Whether or not job duties are 'essential duties' is informed by the particular facts as well as by the guidelines adopted by the MCAD and Federal cases and regulations."); Cargill, 60 Mass. App. Ct. at 594, 804 N.E.2d at 385 ("In giving content to the term, the Supreme Judicial Court has looked to both the Massachusetts Commission Against Discrimination (MCAD) guidelines and to Federal case law and regulations.")

The Massachusetts Appeals Court looked to the MCAD guidelines to define that the "'essential functions' of the job are those functions which must necessarily be performed by an employee in order to accomplish those functions which must necessarily be performed by an employee in order to accomplish

the principal objectives of the job." Cargill, 60 Mass App. Ct. at 594-95, 804 N.E.2d at 385 quoting from MCAD Guidelines: Employment Discrimination on the Basis of Handicap Chapter 151B, § II.B (1998). Federal Courts have held that an essential function is a "fundamental job duty" and does not include "marginal functions of the position." Cargill, 60 Mass. App. Ct. at 595, 804 N.E.2d at 385 quoting from Ward v. Massachusetts Heath Research Inst., Inc. 209 F.3d 29, 34 (1st Cir. 2000).

An employer's judgment as to what constitutes an essential job function "is to be 'tested by relevant guidelines' coupled with the totality of factual information surrounding the job and its various functions." Cargill, 60 Mass. App. Ct. at 595, 804 N.E.2d at 385. The relevant federal regulation lists, but does not limit, factors to consider in determining whether a job function is essential. "(i) The function may be essential because the reason the position exists is to perform that function; (ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or (iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function." Cargill, 60 Mass. App. Ct. at 595, 804 N.E.2d 377 at 385-86 quoting 29 C.F.R. § 1630.2(n)(2)(i)-(iii) (2003).

Evidence to weigh whether a job function is essential

includes but is not limited to, "(i) The employer's judgment as to which functions are essential; (ii) Written job descriptions prepared before advertising or interviewing applicants for the job; (iii) The amount of time spent on the job performing function; (iv) The consequences of not requiring the incumbent to perform the function; (v) The terms of a collective bargaining agreement; (vi) The work experience of past incumbents in the past job; and/or (vii) The current work experience of incumbents in similar jobs. Cargill, 60 Mass. App. Ct. at 596, 804 N.E.2d 377 at 386 quoting 29 C.F.R. § 1630.2(n)(3)(2003). See also Labonte, 424 Mass. at 823 n.13, 678 N.E.2d at 860 n.13 (listing the same factors).

A determination of whether a job function is essential "should be based upon more than statements in a job description and should reflect the actual functioning and circumstances of the particular enterprise involved." Cox, 414 at 384, 607 N.E.2d at 1040 quoting from Hall v. United States Postal Serv., 857 F.2d 1073, 1079 (6th Cir. 1988); Cargill, 60 Mass. App. Ct. at 597, 804 N.E.2d 377 at 386 n 14 quoting from Ward v. Massachusetts Health Research Inst., Inc., 209 F.3d 29, 34 (1st Cir. 2000) ("the employer's view of job requirements in the absence of evidence of discriminatory animus is only one factor in the analysis.")

In the present case, Mr. St, Laurent is a "qualified handicapped person" under the statute. First, his receipt of

workers' compensation benefits alone allows him to make a prima facie case as the legislature wanted to protect injured workers through chapter 152, § 75B. Secondly, Mr. St. Laurent had a back condition that effected a major life function, work. When he was cleared to return to work full duty by his treating doctor, he was "regarded as" disabled and discriminated against by UPS for its fear of his disability causing more injuries.

A material fact in dispute is whether the ability to lift up to 70 pounds was an "essential function" of the job and how often. Although UPS relies on the written job description of a package car driver that states it is an essential function, the case law shows that a written job description alone is not dispositive of whether or not a job function is essential, but rather should be weighed with other factors. Further, UPS puts far roo much weight on the Collective Bargaining Agreement. This emphasis is misplaced as Cargill only identifies such agreement as one of several factors to consider.

In this case, Mr. St. Laurent spends most of his day driving, and his knowledge of driving and the routes are the skilled elements of his job. Mr. St. Laurent rarely lifts heavy weights on his own and there are usually mechanical devices to assist in the lifting. A small fraction of his job duties requires lifting up to seventy pounds without mechanical assistance, if this is even required at all. Furthermore, UPS cannot argue that the strict seventy pounds is an essential job

function because in the past it offered Mr. St. Laurent work with a lifting restriction.

Under the opinion of his doctor, Mr. St. Laurent could perform all of his job duties. Dr. Burden's limitations did not "interfere in any way with [his] ability to drive or any of the elements of driving a truck" and the only limitations that Dr. Burden placed on him was repetitive heavy lifting and that "almost all" of the lifting element of his job could have been done with Dr. Burden's restriction. Furthermore, Mr. St. Laurent's testified that he did not often have to lift heavy packages and when the situation arose carts were available, and any potential heavy lifting was not repetitive because most sites are separated by driving time. He also testified that UPS's new trucks are designed to make getting packages in and out easier. Dr. Burden never opined that Mr. St. Laurent could not lift seventy pounds; he just should refrain from repetitive heavy lifting to avoid further injury.

Additionally, during Discovery, Mr. St. Laurent requested information from UPS requiring a breakdown as to how many packages delivered per day actually weigh less than ten pounds, less than fifty pounds, less than seventy pounds, and over seventy pounds, but the Insurer refused to provide this information. Therefore, a material issue in dispute is how often Mr. St. Laurent would be required to lift packages weighing up to 70 pounds and whether this job function is a "fundamental" or

"marginal" part of the job.

At no time during the defense of this case does UPS provide a legitimate, non-discriminatory reason for its actions. Based on the totality of the factual situation, a reasonable fact-finder could conclude that Mr. St. Laurent was a "qualified handicapped person" who could perform the essential functions of his job with or without a reasonable accommodation. In the light most favorable to Mr. St. Laurent, he could perform all job duties per the opinion of his treating doctor, and Dr. Burden placed on him only the slightest restriction of no repetitive heavy lifting. As such, UPS's request for summary judgment should be denied.

**B. UPS Failed To Provide Mr. St. Laurent With A Reasonable Accommodation**

An employer is required to provide a reasonable accommodation, if that accommodation will allow an employee with a disability to perform the job's essential functions, unless that accommodation would be an undue hardship. Mass. Gen. L. ch 151B, § 4(16)(2004). A reasonable accommodation includes "job restructuring, part-time or modified work schedules, . . . and other similar accommodations for individuals with disabilities. Garcia-Ayala v. Lederle Parenterals, Inc., 212 F3d 638 (1st Cir. 2000); Massachusetts Commission Against Discrimination Guidelines: Employment Discrimination On The Basis Of Handicap --

Chapter 151B, at 6 (1998). A reasonable accommodation does not require the employer to impose on itself a financial or administrative burden or waive an employee's inability to perform an essential job function. Cox, 414 Mass. at 383, 607 N.E.2d at 1040. The employer has the burden of proving that a reasonable accommodation is an undue hardship. Garcia-Ayala v. Lederle Parenterals, Inc., 212 F3d 638 (1st Cir. 2000).

Once an employer is placed on notice, or should have known, that an employee requires an accommodation, the employer has an affirmative duty to offer some form of reasonable accommodation. Russell v. Cooley Dickinson Hospital, Inc. 437 Mass 443, 457, 772 N.E.2d 1054, 1065 (2002). The employer is required to engage the employee in a "flexible, interactive process that involves both the employer and the qualified individual with a disability." Id. quoting 29 C.F.R. § 1630 App.(2001). "Given the remedial purpose of preserving the employment status of a qualified handicapped person by making reasonable accommodations, the statute requires a court to measure whether the employer's decision 'reflects a well-informed judgment grounded in a careful and open-minded weighing of the risks of the alternatives. . . ." Cargill, 60 Mass. App. Ct. at 603, 804 N.E.2d at 390.

UPS's allegation that Mr. St. Laurent never made a request for a reasonable accommodation is inaccurate. Mr. St. Laurent would periodically call UPS to get an update on when he could return to his position or, if that was not possible, what "he

could do next." In return, according to Mr. St. Laurent's testimony, UPS "wouldn't entertain any thought of accommodating [him]." In June of 2001, Mr. St. Laurent approached his supervisor, Tom McGovern, and requested alternative work, specifically feeder school. UPS failed to act on Mr. St. Laurent's request for reasonable accommodation. Furthermore, Mr. St. Laurent had a legitimate reason for believing UPS would accommodate him because in the past UPS had accommodated him after he returned to work from a work-related injury in 1996. Never once did UPS explain why it could not accommodate him with a limitation on his ability to lift, as it had done in the past.

Additionally, UPS discriminated against Mr. St. Laurent as it failed to provide the minor accommodation suggested by Dr. Burden. Dr. Burden opined that Mr. St. Laurent could return to work at UPS as a driver "if consideration were given to his degree of repetition of lifting on the job requirement description of seventy pounds and the occasional lifting and moving up to one hundred fifty pounds." This statement indicates that Mr. St. Laurent can work without restrictions, but it would be helpful if an accommodation is provided. Dr. Burden explained that Mr. St. Laurent can work, and can lift 70 to 150 pounds, but should not lift this heavy weight repetitively. UPS discriminated against Mr. St. Laurent when it failed to provide an accommodation, or allowed him to return to work.

One of the most common accommodations in the workplace is

allowing an employee to work with a weight restriction by assigning the employee to light duty work, or providing the employee with assistance regarding heavy lifting. Mr. St. Laurent testified that the majority of his work did not require heavy lifting, and it was not a repetitive job as he would typically deliver a few packages, then would drive to another location to deliver a package. Additionally, Mr. St. Laurent typically lifted packages that weighed under 25 pounds. Heavier packages were rare and Mr. St. Laurent was never required to lift more then 70 pounds alone. He was rarely required to lift this weight without the assistance of a mechanical device.

Dr. Burden opined that Mr. St. Laurent can lift 70 lbs to 150 lbs, but should not do this frequently. Mr. St. Laurent could have performed his regular duties within these restrictions. If he could not, UPS should have provided an accommodation that could have included not requiring Mr. St. Laurent to lift those few packages that weighed 70 pounds, minimize the number of 70 pounds packages, or provide assistance when he lifted those packages. These would have been minor accommodations, and UPS would not be able to satisfy its burden of proving that this accommodation was an undue hardship, especially in light of the fact UPS is a multi-million dollar company with thousands of employees. Instead, UPS failed to engage in any interactive process to determine what accommodation would be appropriate, and refused to communicate with an employee

of over twenty-five years about his livelihood and ability to return to work.

A reasonable fact-finder could conclude that Mr. St. Laurent was discriminated against as UPS failed to reasonably accommodate him. Summary judgment should be denied.

### C. UPS' Requirement That Mr. St. Laurent See Two Doctors, In Addition To His Treating Doctor, Was Discriminatory

In Massachusetts a prima facie case is made if an employee is "being regarded as having" a disability. M.G.L. ch. 151B, § 1(17)(c)(2004). Dartt, 427 Mass. at 17, 691 N.E.2d at 536. '[T]aking the question out of the jury's hands is disfavored in the context of discrimination cases based on disparate treatment because the ultimate issue is often that of intent, and is a factual question." Dartt, 427 Mass. at 16, 691 N.E.2d at 536, citing Labonte v. Hutchins & Wheeler, 424 Mass. 813, 820, 678 N.E.2d 853 (1997).

Even if UPS is able to establish that its actions were legitimate, non-discriminatory actions, a fact-finder could reasonably conclude that these actions were pretextual. Mr. St. Laurent identified multiple witnesses who testified that they returned to work at UPS, even after undergoing serious surgeries, without being required to see a doctor other than their own.

Despite no physical improvement since he first provided a note from his doctor stating he could work in May of 2001, Mr. St. Laurent was finally allowed to undergo a functional capacity

evaluation in October of 2002 where he actually lifted weights to prove he could do his job. This was allowed only after advocacy by himself and his attorney. He passed this test with ease. As such, the entire process Mr. St. Laurent was forced to undergo was pretextual as Mr. St. Laurent received disparate treatment.

Additionally, UPS "regarded" Mr. St. Laurent as being disabled, when in fact, his doctor released him to full duty work. Quite simply, UPS was attempting to keep Mr. St. Laurent out of a job because it considered him disabled. An inference can be made that UPS considered Mr. St. Laurent a risk for additional workers' compensation claims. This is in-part why it refused to let Mr. St. Laurent return to work. The issue of intent should be determined by a jury.

**CONCLUSION**

For the reasons argued herein, this Honorable Court should deny UPS's motion for summary judgment and allow this case to go to trial.

Respectfully submitted,
Peter St. Laurent
By His Attorney

Seth J. Elin (BBO# 636099)
KECHES & MALLEN, P.C.
122 Dean Street
Taunton, MA 02780
(508) 822-2000

**CERTIFICATE OF SERVICE**

**I hereby certify that a true copy of the above document was served upon the attorney(s) of record for each other party by mail/hand on** 7/6/05

Dated: July 6, 2005