UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| PETER ST. LAURENT, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| v. | ) | NO. 04-11951 NG |
| | ) | |
| UNITED PARCEL SERVICE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF DECISION AND ORDER
## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

January 4, 2006

DEIN, U.S.M.J.

## I. INTRODUCTION

The plaintiff Peter St. Laurent ("St. Laurent") is employed by the defendant United Parcel Service, Inc. ("UPS") as a package car driver. He has brought this action alleging that UPS discriminated against him because of an actual or perceived handicap in violation of Mass. Gen. Laws ch. 151B when it refused to allow him to return to work during the period of May 2001 until October 2002, following a back injury. The matter is presently before the court on UPS's motion for summary judgment. (Docket No. 15). Because this court finds that the plaintiff was not able to perform the essential elements of his job with or without accommodation, the motion for summary judgment is ALLOWED.

## II.  <u>STATEMENT OF FACTS</u>[1]

The following facts are stated in a light most favorable to the plaintiff, the party

opposing the motion for summary judgment.  <u>See</u> <u>Higgins v. New Balance Athletic Shoe,</u>

<u>Inc.</u>, 194 F.3d 252, 257 (1st Cir. 1999).

### <u>Job Responsibilities</u>

St. Laurent is a 56 year old man, who has been working for UPS as a package car

driver since 1974.  Package car drivers at UPS are represented by the Teamsters Union,

and the terms of employment for package car drivers are governed by a collective

bargaining agreement ("CBA").  DF ¶¶ 2, 3.

UPS has a written job description for its drivers, which provides in relevant part as

follows:

> <u>Overview</u>:
>
> Involves driving a commercial-sized vehicle that uses a standard
> transmission.  Must be able to <u>deliver and pick up packages at a
> constant pace during a full work shift</u>, working in accordance with
> prescribed methods and performance standards.  Drivers must meet
> all of the requirements as specified by the D.O.T.

Rossi Aff. Ex. B (emphasis added).  In addition, the written job description provides a

listing of essential functions, which includes the following:

---

[1]  The facts are derived from the defendant's Separate Statement of Undisputed Facts
("DF") (Docket No. 19) and related exhibits ("Def. Ex.") (Docket No. 20), the Affidavit of Neal
Rossi, UPS Public Affairs Manager, and attached exhibits ("Rossi Aff.") (Docket No. 18),
Plaintiff's Response to the defendant's statement of facts ("PR") (Docket No. 24), and the
exhibits submitted by the plaintiff as part of its Opposition to the motion for summary judgment
("Opp." and "Pl. Ex.") (Docket No. 23).

Essential Functions (must be able to):

   - To bend, stoop, crouch, climb, stand, sit, walk and turn/pivot for
     up to 9.5 hours per day, 5 days per week

   - Lift/lower, push, pull and carry up to 70 pounds.

Id. (emphasis added).

St. Laurent agreed at his deposition that this job description is consistent with the work he was expected to perform each day. Def. Ex. A (Depo. Transcript vol. I) at 26. Specifically, but without limitation, St. Laurent described his job as delivering and picking up packages ranging in weight from an envelope up to 70 pounds without assistance, and 150 pounds with assistance. Id. at 7-8.[2] He made approximately 95-110 deliveries and 28 pick-ups each day. Id. at 8. He has had the same route for almost 20 years. Id. at 13. The pick-ups could involve as many 600 boxes from a chocolate factory during the Christmas season. Id. at 8-9. He averaged approximately 230-250 packages for delivery each day. Id. at 12. In a few places he could use a cart to help with deliveries and could unload on a dock. Id. In other places he walked down long driveways and up and down stairs, including deliveries to the second floors of houses. Id. at 17. The newer UPS trucks were built lower to the ground, making it easier to get packages in and out of the truck. See id. at 16. St. Laurent estimated that about half of

_____

[2] While St. Laurent contends that the "vast majority" of his deliveries required lifting under 70 pounds, see PR ¶ 7, that characterization is not supported by the record. At his deposition, St. Laurent did not estimate the weight of his deliveries. See Def. Ex. A at 7-8. This is not the only time when the parties' "facts" are based on an overly generous reading of the record. Consequently, the court has reviewed the cited portions of the transcripts and has not relied on either party's characterizations.

his time was spent driving, while half was spent lifting.  Def. Ex. B (Depo. Transcript vol. II) at 17.

### The Plaintiff's Injury

On November 13, 2000, St. Laurent suffered a back injury when he dropped his keys, leaned over to pick them up, and strained his back.  Def. Ex. A at 19.  He was out of work until approximately December 10, 2000 as a result of this injury.  Id.  St. Laurent came back and worked until January 9, 2001, at which time "the pain wouldn't go away" and "it got unbearable to keep working[.]"  Id. at 19-20; Pl. Ex. A.  He was out of work until January 21, 2001, during which time he received Workers' Compensation benefits.[3] Pl. Ex. A.

St. Laurent then returned to work until March 26, 2001, when his "back kicked in" again and he left work because he "couldn't perform [his] duties."  Def. Ex. A at 20. St. Laurent was not doing anything in particular which caused him such pain that he had to leave work, it was just that "every day was aggravating" and "every day [his] back became painful" when he was working as a package car driver.  Id. at 20-21.  When he left work, St. Laurent again began receiving Worker's Compensation benefits.  See Pl. Ex. A.

---

[3]  The parties' descriptions as to when St. Laurent left work in January and when he returned are somewhat inconsistent.  Since the facts are not material to this dispute, the court has recreated the time-line from the documents produced as best it could.

It is undisputed that on May 22, 2001, St. Laurent was examined by Dr. Isadore Yablon, an orthopedic surgeon, and that the examination was required by either UPS or its Worker's Compensation carrier. See DF ¶¶ 16, 17; PR ¶¶ 16, 17. It is unclear whether this examination was in response to St. Laurent indicating that he was prepared to come back to work, or was motivated by the employer or insurer. Id. This court finds that the discrepancy is not material.[4] In any event, Dr. Yablon diagnosed St. Laurent with "Back pain secondary to degenerative arthritis." Pl. Ex. B. His "conclusions" were as follows:

> His arthritis may not have been caused by his work but certainly could have been aggravated by it. I believe in this case, Mr. St. Laurent experienced an aggravation of a pre-existing condition.
>
> He is capable of returning to work but should be restricted from lifting anything more that 25 pounds. Given this restriction, it is quite possible that the frequency of back pain will be lessened. It is not possible to recommend any plan of treatment or work conditions where it could be assured that he would not suffer any recurrence of back pain because of his spinal arthritis.

Pl. Ex. B (emphasis added). While the report is dated May 22, 2001, it is unclear when it was received by UPS.

---

[4] UPS contends that the examination was ordered in accordance with the terms of the collective bargaining agreement, which provides that once an employee notifies the employer that he or she has been released to work by his/her doctor, the employer can require an examination by the company's doctor within three (3) working days from the time the employee brings the return-to-work slip to the employer. Rossi Aff. Ex. A, § 2. St. Laurent contends, however, that he was examined by Dr. Yablon before he brought in his own doctor's note.

On May 25, 2001, St. Laurent apparently went to his own doctor, Dr. Greiner, who had been treating him for lumbar strain.  Pl. Ex. C.  This Doctor found him to be excused from work during the period April 20, 2001 through May 28, 2001, and able to return to work on May 29, 2001.[5]  Id.  There is no description in this report at all, and no discussion as to St. Laurent's weight-lifting capabilities.

### Plaintiff's Alleged Request for Accommodation

Again, the chronology of events is unclear.  However, according to St. Laurent, when he came to work with Dr. Greiner's note, his supervisor, Tom McGovern, would not let him return until the company received the report from Dr. Yablon.  See Pl. Ex. D (St. Laurent Affidavit) at ¶ 3.  St. Laurent went home.  He returned to work again two weeks later, in mid June 2001, and in an affidavit filed in opposition to the motion for summary judgment he describes the events that occurred as follows:

> Approximately two weeks later, mid June 2001, I went to see Tom McGovern to find out when I could return to full duty work per the clearance of my doctor.  He told me that I was not able to return because I had a lifting restriction per UPS's doctor.  While I do not remember my exact quote, I specifically told Tom McGovern that if he is claiming that I cannot lift, then give me a job that does not require lifting, and he could even send me to feeder school.

> One month later, I followed-up with Tom McGovern about my request for alternate work, specifically feeder school, and he told me that was not an option.

---

[5]  There is no explanation why the excused period began on April 20, 2001.  St. Laurent had been out of work since March 26, 2001.

Pl. Ex. D at ¶¶ 4, 5 (emphasis added).  At his earlier deposition, however, St. Laurent had

testified as follows:

> Q.  Now, during the time period between March 26, 2001, and
> October 11, 2002, did you request any type of accommodation so
> that you could return to work?
>
> A.  No.

Def. Ex. B at 6.  He testified further as follows:

> Q.  You testified earlier that you did not request an accommodation.
> Now, during your conversation with Tom McGovern, did you make
> any suggestions as to what other positions you could perform?
>
> A.  No, my conversation with him was just I wanted my job back.
> . . . .
> Q.  Did you tell Mr. McGovern if they were not willing to give you
> your job back, you would do whatever work they had available?
>
> A.  I don't recall.

Id. at 16, 19.  St. Laurent contends that this refusal to allow him to return to work was

discriminatory and in sharp contrast to UPS's decision in 1996 when, after a work-related

injury, it offered him a light-duty position.  See id. at 18.

It is undisputed that on July 30, 2001, UPS provided St. Laurent a list of three

doctors, and asked him to select one to conduct an impartial examination.  See Def. Ex.

D.  St. Laurent contends that he selected one doctor, but was told, about five weeks later

and without explanation, that he had to choose one of the other two, which he refused to

do.  Def. Ex. A at 27.  It is further undisputed that on September 12, 2001, UPS sent St.

Laurent another list of three orthopedic doctors, and asked him to choose one to conduct

an impartial examination.  Def. Ex. D.  St. Laurent selected Dr. Nason Burden, who

St. Laurent had known since he was a child.  Def. Ex. A at 28.  St. Laurent was examined

by Dr. Burden on October 12, 2001.  See Def. Ex. E.

UPS contends that the selection of a doctor was done in accordance with the CBA,

which provides that if the employee's and employer's doctors disagree about an

employee's ability to return to work, "the Employer and the Union shall mutually agree

upon a third (3rd) doctor within (10) working days, whose decision shall be final and

binding on the Employer, the Union and the employee."  Rossi Aff. Ex. A at Art. 20, § 3.

While St. Laurent admits that the steps as described above were taken, he denies that it

was done in accordance with the CBA.  See DF ¶¶ 19-20, PR ¶¶ 19-20.  Moreover, St.

Laurent contends that he was being discriminated against because other employees were

allowed to return to work following injuries with, at most, just a doctor's note, and he has

submitted affidavits from other employees to support this claim.  See PR ¶ 20; Pl. Exs. E,

F & G.

As noted above, Dr. Burden evaluated St. Laurent on October 12, 2001, and issued

a report dated October 18, 2001.  Def. Ex. E.  As detailed therein, St. Lauren had had

back problems since 1978, when a ruptured disc required surgery.  Id. at 1.  After the

surgery, he had complete relief until 1991, when "picking up a heavy object and

transferring the object with some torque stretching" resulted in a new injury which had

kept him out of work for two months.  Id.  There were four other occurrences, which

eventually resulted in the absences from work as described above.  Id.

According to Dr. Burden, St. Laurent was taking 500 mgs. of Naprocin, daily.  Id. at 2.  St. Laurent told Dr. Burden "that he would like very much to get back to work but had a difficult time because of alle[ged] problem with his supervision and difficulty with his intermittent recurrence of back pain and resulting conditions that prevent him in carrying out his full industrial assignment."  Id.  Dr. Burden reviewed St. Laurent's MRIs and concluded that they "show the patient to have a 'very mild' spinal stenosis of L-4 and L-5 and a minimal amount of degenerative disc disease."  Id. at 1.  Dr. Burden diagnosed St. Laurent as having a "recurrent lumbro-sacral strain."  Id. at 2.  Dr. Burden's "opinion" was as follows:

> It is the opinion at this time that Mr. St. Laurent has had successful low back surgery as described above with a period of remission and varying periods of lumbro-sacral strain.  As a result he has had a somewhat interrupted period of full industrial responsibility regarding truck driving and lifting weights.

> It is significant at this examination that Mr. St. Laurent has very little, if any, objective evidence of residual problem with his lower back and that whatever difficulty he has is a matter of history and has to be considered as being symptomatic without significant factual orthopaedic manifestations at this time.

> It is the further opinion of this examiner that it is rather obvious that with his frequent interrupted work schedule performance that a better effective work effort would be expected if he had some restriction on lifting heavy wieghts [sic], particularly in a repeated manner or such as is exerted on the lower back with torque twisting function when loaded.

> It is observed that the patient expressed a desire to get back into his industrial assignment and this examiner suggests the possibility or probability of a cooperative working ethic might be evolved.

> It is not unusual to have recurrent problems with intermittent chronic lumbosacral strain in a patient who has had successful disc syndrome surgery - undoubtedly the present situation as described is a direct result of the initial injury that goes back to 1978.

Id. at 2-3 (emphasis added).  Due to the lack of clarity in this report, St. Laurent requested a second report from Dr. Burden.  DF ¶ 23; PR ¶ 23.  On November 9, 2001, Dr. Burden issued an addendum to his earlier report, which stated in relevant part as follows:

> [T]he best advice concerning [St. Laurent's] ability to return to his industrial activity would be secured if indeed he would be considered in the frequency of heavy weight loading on his back.  It is the opinion of this examiner that this worker would be an adequate performer if consideration were given to his degree of repetition of lifting on the job requirement description of seventy pounds and the occasional lifting in moving up to one hundred fifty pounds.
>
> The job description describes average weight of twelve pounds which seems to be indicative of the patient's present capacity provided it wouldn't be that of repetitive nature as described above. It is further observed that torque loading of the back in twisting should be a consideration to be limited as much as possible.
>
> It is the further opinion of this examiner that if consideration and good cooperation were effected by the employer and his immediate supervisor that Mr. St. Laurent would be a useful employee in the workings of the United Parcel Service.
>
> It is my further opinion that these considerations would best service the worker and employer if they were carried out during the course of his future employment.

Def. Ex. F.  While St. Laurent recognized that this report had identified some limitations on his ability to do his job, he did not believe that the limitations interfered with his "ability to drive or any of the elements of driving a truck."  Def. Ex. B at 17.  Moreover,

-10-

to the extent that Dr. Burden had identified that there were limitations on St. Laurent's ability to do "repetitive heavy lifting," St. Laurent believed that he could have done "almost all" of his job with a restriction on such lifting. Def. Ex. B at 18. For its part, UPS interpreted the report as stating that St. Laurent could not perform all the functions of his job as a package car driver. See DF ¶ 24. St. Laurent remained out of work.

On July 26, 2002, St. Laurent brought a note to UPS from his doctor, Dr. Greiner, which provided that he could return to work any time without limitation. Pl. Ex. L. In response, UPS set up an appointment for St. Laurent to be examined by Dr. Naparstek. Def. Ex. A at 34. Dr. Naparstek examined St. Laurent on September 11, 2002.

Dr. Naparstek noted that St. Laurent "has had a significant number of injuries dating back to 1978 when he underwent his discectomy" and that there were 18 incidents between May 1, 1991 through March 26, 2001, mostly involving low back injuries. Def. Ex. G at 1. Further, the Doctor noted that "Mr. St. Laurent has been out of work for essentially one and a half years at this point and is significantly deconditioned." Id. at 2. According to St. Laurent himself, he takes Naprosyn most days "and can feel diffusely sore after a day of activity." Id. Dr. Naperstek concluded as follows:

> After a thorough consideration of his history and physical examina-
> tion, it is my medical opinion that at present Mr. St. Laurent has
> significant vulnerability upon returning to a full duty job. The
> physical findings of his back and previous injuries do suggest a
> vulnerability to future injury. Most importantly however the
> significant deconditioning that exists at this time mandates that a
> more careful return to work be considered. Consequently, Mr. St.
> Laurent is not fit for duty at this time. However I have strongly
> recommended that he pursue an aggressive and supervised training

> program on his own.  I have emphasized the need for a trainer to
> supervise his progress in such a training program to ensure that no
> secondary injury occur.  Following a training period of approxi-
> mately three to four weeks I recommend that a full and thorough
> Functional Capacity Evaluation be performed.  Consequently within
> one month Mr. St. Laurent would be expected to be ready for a
> Functional Capacity Evaluation which can lead to a reality based and
> specific elucidation of his safe functional level.

Id. (emphasis in original).  St. Laurent did follow Dr. Naparstek's recommendation and

did work out at a gym.  DF ¶ 27; Def. Ex. H.  He was seen by Dr. Naparstek again on

October 9, 2002, at which time he was examined and then given a Functional Capacity

Evaluation.  Def. Ex. H at 1.  The test involved repetitive lifting, crouching, bending,

pushing, and pulling, among other things.  Id. at 1-2.  He was able to lift 70 pounds on his

own and 150 pounds with assistance, as well as to maneuver a pallet jack weighing 250

pounds.  Id.  Dr. Naparstek concluded as follows:

> Consequently within a reasonable degree of medical certainty, it is
> my medical recommendation that Mr. St. Laurent return to work at
> full duty without restriction as of Friday, October 11, 2002.  I have
> indicated to him that there will always be an increased vulnerability
> for reinjury in the future.  However if he is fully committed to
> maintaining his weight training regimen and cardiovascular
> conditioning it is my medical opinion that the risk of reinjury is low.

Id. at 2.  UPS permitted St. Laurent to return to work on October 14, 2002.  DF ¶ 29.

### III.  ANALYSIS

#### A.   Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there

-12-

is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant . . . would permit a rational fact finder to resolve the issue in favor of either party."  Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (internal citations omitted).  A material fact is one which has the "potential to affect the outcome of the suit under the applicable law."  Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996) (internal citations and quotation omitted).  In order to defeat the entry of summary judgment, the nonmoving party must submit "sufficient evidence supporting the claimed factual dispute to require a choice between the parties' differing versions of the truth at trial." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993), cert. denied, 511 U.S. 1018, 114 S. Ct. 1398, 128 L. Ed. 2d 72 (1994) (internal citations and quotations omitted).  In evaluating motions for summary judgment, however, the court will not consider "conclusory allegations, improbable inferences, and unsupported speculation." Galloza v. Foy, 389 F.3d 26, 28 (1st Cir. 2004) (internal citation omitted).  Applying this standard to the instant case compels the conclusion that the defendant's motion for summary judgment should be allowed.

### B.    Standard for Handicap Discrimination

St. Laurent has brought this action under Mass. Gen. Laws ch. 151B, § 4(16) which prohibits an employer from discriminating against a "qualified handicapped person."  To establish a claim under this statute, the plaintiff must prove that:

> (1) the plaintiff is handicapped within the meaning of the statute;
> (2) the plaintiff is a "qualified handicapped person" (meaning that,
> notwithstanding the handicap, the plaintiff can perform the essential
> functions of the job, either [a] without accommodation, or [b] with a
> reasonable accommodation provided by the employer, subject to the
> statutory qualification that the accommodation not pose an undue
> hardship upon the employer); and (3) the handicap was the cause of
> the allegedly unlawful discriminatory action.

Cargill v. Harvard Univ., 60 Mass. App. Ct. 585, 586, 804 N.E.2d 377, 379 (2004).  In

the instant case, UPS does not dispute, at least for purposes of summary judgment, that

St. Laurent is "handicapped within the meaning of the statute," i.e., that during the

relevant period he had "a physical or mental impairment which substantially limits one or

more major life activities of a person . . . ."  Mass. Gen. Laws ch. 151B, § 1(19).

Therefore, no further discussion of that element is necessary.  Where the dispute in the

instant case lies is whether St. Laurent's lifting limitations affected an "essential

function" of his job, and whether UPS had the obligation to accommodate St. Laurent's

physical limitations.  Each of these elements will be discussed individually.

### 1.    The Essential Elements of a Package Car Driver's Job

UPS argues that it was an essential element of St. Laurent's job to be able to lift 70

pounds.  St. Laurent argues that he only had to lift that much weight rarely, so it was not

an essential element.  This court disagrees, and finds that UPS's lifting requirements were

an essential element of the package car driver's job.

Determining what are the essential functions of a job involves an assessment of

"what skills must be possessed by, and what work activities necessarily must be

-14-

performed by, an employee in order to accomplish the principal objectives of the job."
Cargill, 60 Mass. App. Ct. at 586, 804 N.E.2d at 380.  It is an "intensely fact-based"
analysis which requires an "'individualized inquiry.'" Id. at 587, 804 N.E.2d at 380
(quoting Cox v. New England Tel. & Tel. Co., 414 Mass. 375, 383, 607 N.E.2d 1035,
1040 (1993)).  See also Labonte v. Hutchins & Wheeler, 424 Mass. 813, 822-23, 678
N.E.2d 853, 860 (1997).  A determination that a function is essential "'should be based
upon more than statements in a job description and should reflect the actual functioning
and circumstances of the particular enterprise involved.'" Cox, 414 Mass. at 384, 607
N.E.2d at 1040 (quoting Hall v. U.S. Postal Serv., 857 F.2d 1073, 1079 (6th Cir. 1988)[6]).
Thus, while an employer's view of job requirements is generally given "substantial
weight," other factors which may be considered include, without limitation, "written job
descriptions, consequences of not requiring the function, work experience of past
incumbents, and work experience of current incumbents."  Ward v. Mass. Health
Research Inst., Inc., 209 F.3d 29, 34 (1st Cir. 2000) (citing 29 C.F.R. § 1630.2(n)(3)).

        In the instant case, the requirement of lifting, pushing, pulling and carrying 70
pounds without assistance is listed as an "essential function" in the written job
description for package car drivers.  Moreover, St. Laurent, himself, testified that this was
a requirement of his job.  Def. Ex. A at 7 (packages he lifts could be 10 pounds or 150

---

        [6]  "The Supreme Judicial Court of Massachusetts has indicated that federal case law
construing the ADA should be followed in interpreting the Massachusetts disability law."  Ward
v. Mass. Health Research Inst., Inc., 209 F.3d 29, 33, n.2 (1st Cir. 2000), and cases cited.

pounds; he had to lift up to 70 pounds without assistance). The undisputed facts establish that a significant portion of St. Laurent's job involved loading and unloading the truck, and carrying packages both as deliveries and pick-ups. St. Laurent had a fixed route — making it clear that the deliveries were not distributed among the drivers by weight. Rather, each driver would have to be able to handle whatever package their customers desired. Under such circumstances, the ability to lift, pull, push, and carry 70 pound packages is an essential element of his job. See, e.g., Guerra v. United Parcel Serv., Inc., 250 F.3d 739 (5th Cir. 2001) (unpublished opinion) (essential element of job of UPS package car driver is to lift 70 pounds without assistance).

St. Laurent's principal argument is that the requirement of lifting such heavy packages does not often come into play. However, the fact that all packages may not weigh on or about 70 pounds is not controlling — such packages certainly could be included in St. Laurent's route, and if they were he would have to deliver them. Based on St. Laurent's own testimony, there is a sufficient likelihood that the need to lift heavy packages could arise so that the employer's requirement that the package car driver lift such packages should be controlling.[7] See Cox, 414 Mass. at 386-87, 607 N.E.2d at 1042 (even though pole climbing by means of gaffs may rarely occur, this skill was an essential element of splice service technician's job, since the need might arise in an emergency).

---

[7] For this reason, St. Laurent's complaint that he did not get discovery about the break-down of the weight of packages delivered per day is not relevant to the summary judgment motion. See Opp. (Docket No. 23) at 16. St. Laurent has admitted that on occasion he has had to deliver packages weighing 70 pounds.

Thus, the ability to lift heavy packages is not a "marginal function" of the position of package car driver.  See Cargill, 60 Mass. App. Ct. at 594-95, 804 N.E.2d at 385.

Moreover, the evidence is undisputed that at the relevant time, St. Laurent was not able to lift packages weighing anything close to 70 pounds.  Dr. Yablon, on May 22, 2001, restricted St. Laurent from lifting anything more than 25 pounds.  Dr. Burden, on November 9, 2001, put St. Laurent's lifting ability at approximately 12 pounds, and even then only if it was not repetitive.  Finally, on September 11, 2002, Dr. Naperstek examined St. Laurent and concluded that he "was not fit for duty" at that time.  Thus, the undisputed facts establish that during the relevant period St. Laurent was not able to perform an essential function of his job without accommodation.

## 2.    **Reasonable Accommodation**

Since St. Laurent could not perform an essential function of his job, the next issue which must be resolved is whether St. Laurent could perform the essential function of his job with a reasonable accommodation.  See Ward, 209 F.3d at 33.  St. Laurent contends that UPS is liable for not providing a reasonable accommodation either by sending him to feeder school or by "not requiring Mr. St. Laurent to lift those few packages that weighed 70 pounds, minimiz[ing] the number of 70 pound packages, or provid[ing] assistance when he lifted those packages."  Opp. (Docket No. 23) at 20.[8]  For its part, UPS denies

---

[8] St. Laurent proposes this accommodation on the basis that "Dr. Burden explained that Mr. St. Laurent can work, and can lift 70 to 150 pounds, but should not lift this heavy weight repetitively."  Opp. at 19-20.  This is not what Dr. Burden opined.  Dr. Burden concluded that St. Laurent was capable of lifting approximately 12 pounds but should not do so repetitively.

that St. Laurent ever requested any accommodation, and that, in any event, it was not

obligated to waive an essential function of the job.  Because this court agrees that under

the facts of this case UPS did not have to provide St. Laurent with a position that did not

involve heavy lifting, the motion for summary judgment will be allowed.

 The law is clear that "the burden of showing reasonable accommodation is on the

plaintiff," while the employer has the burden of proving that such an accommodation

would cause it "undue hardship."  Garcia-Ayala v. Lederle Parenterals, Inc., 212 F.3d

638, 648-49 (1st Cir. 2000).  Undue hardships include financial hardships as well as

"accommodations that are unduly extensive, substantially disruptive, or that would

fundamentally alter the nature or operation of the business."  Id. at 650.  The employer's

burden of proving an inability to accommodate is triggered only "after a plaintiff

produces sufficient evidence to make at least a facial showing that reasonable

accommodation is possible."  Cargill, 60 Mass. App. Ct. at 603, 804 N.E.2d at 390

(internal quotations omitted).

 In the instant case, there is no reason to tackle the difficult issue of whether

St. Laurent's alleged comments to Tom McGovern about attending feeder school were

sufficient to constitute a request for accommodation, and/or whether UPS had a more

extensive, independent duty to initiate or engage in discussions about possible

alternatives to his job responsibilities.  See, e.g., Russell v. Cooley Dickinson Hosp., Inc.,

437 Mass. 443, 457, 772 N.E.2d 1054, 1065 (2002) ("'[I]t is the employee's initial

request for an accommodation which triggers the employer's obligation to participate in

the interactive process of determining one.'") (quoting Taylor v. Principal Fin. Group, Inc., 93 F.3d 155, 165 (5th Cir. 1996), cert. denied, 519 U.S. 1029, 117 S. Ct. 586, 136 L. Ed. 2d 515 (1996)).  Even assuming that UPS should have engaged in a more interactive process, all of the alternatives proposed involved writing heavy lifting out of St. Laurent's job description.  Consequently, St. Laurent cannot "show the existence of a reasonable accommodation."  Phelps v. Optima Health, Inc., 251 F.3d 21, 26 (1st Cir. 2001).

This is not a situation where St. Laurent was fired or denied leave, so that perhaps less draconian measures should have been considered.[9]  Rather, St. Laurent was allowed leave, and received worker's compensation benefits, but now proposes that others should have been assigned the task of lifting heavy packages which normally would have been assigned to him.  However, "an employer need not exempt an employee from performing essential functions, nor need it reallocate essential functions to other employees."  Id. at 26, and cases cited.  Thus, under both Federal and Massachusetts law, "reasonable accommodation does not include waiving or excusing an inability to perform an essential job function."  Cox, 414 Mass. at 390, 607 N.E.2d at 1043-44.

St. Laurent's other alternative, feeder school, fares no better.  As an initial matter, it seems that St. Laurent is seeking training for a position he was not otherwise qualified

---

[9]  Compare Moroney v. United Parcel Serv., Inc., 70 F. Supp. 2d 1267, 1270-71 (D. Kan. 1999) (UPS's motion for summary judgment denied where plaintiff's employment terminated when he could not do heavy lifting as a package car driver; company did not consider temporary alternatives, including transfer to another position).

to perform.[10]  Moreover, Mass. Gen. Laws ch. 151B, § 4(16), unlike its federal counter-

part, does not define reasonable accommodation to include reassignment to vacant

positions, and under neither federal nor state law is an employer obligated to create a new

position for the plaintiff.  Russell, 437 Mass. at 454, 772 N.E.2d at 1063.  See also Lolos

v. Solutia, Inc., 193 F. Supp. 2d 364, 373 (D. Mass. 2002) (Mass. Gen. Laws ch. 151B,

§ 4(16) does not require an employer to consider reassigning an employee to another

position as a reasonable accommodation).  The fact that, in the past, UPS may have

assigned St. Laurent to a light duty position "does not obligate [UPS] to continue

providing such an accommodation."  Phelps, 251 F.3d at 26.  For all these reasons, UPS

was not required to allow St. Laurent to return to work while he was unable to perform

the essential functions of a package car driver.

Finally, St. Laurent's argument that he was "perceived as disabled" and/or treated

differently than other employees who were allowed to return to work without a doctor's

note or with only their own doctor's note is without merit.  None of the affidavits

establish that the allegedly comparable employees had the extensive history of repetitive

injuries actually comparable to St. Laurent's history.  See Pl. Exs. E-G.  Moreover, while

there is some question as to the sequence of events, there is no question that the CBA

allowed UPS to require its own examination of its injured employee, and authorized a

---

[10]  St. Laurent has not identified any other positions which he could have filled, and, therefore, has not met his burden of establishing the existence of other alternatives.  See Phelps, 251 F.3d at 27 (plaintiff has the burden of proof in showing that other vacancies exist).

third opinion when there was a disagreement between doctors.  There is nothing in the

record to indicate that UPS in any way exceeded its contractual rights.

## IV.  CONCLUSION

For all the reasons detailed herein, the motion of UPS for summary judgment

(Docket No. 15) is ALLOWED.

_____ / s / Judith Gail Dein_____
Judith Gail Dein
United States Magistrate Judge